## RICHARD GILLIS *v.* WHITE OAK CORPORATION ET AL.
### (AC 21361)

Foti, Schaller and Flynn, Js.

Argued January 17—officially released November 12, 2002

*Taka Iwashita,* assistant attorney general, with whom were *Michael J. Belzer,* assistant attorney gen-

eral, and, on the brief, *Richard Blumenthal*, attorney general, and *William J. McCullough*, assistant attorney general, for the appellee (defendant second injury fund).

*James D. Moran, Jr.*, with whom was *James L. Sullivan*, for the appellees (named defendant et al.).

*Opinion*

SCHALLER, J. The defendant second injury fund (fund) appeals from the decision of the workers' compensation review board (board) affirming the determination by the workers' compensation commissioner (commissioner) that the defendant White Oak Corporation (White Oak) timely notified the fund, pursuant to General Statutes (Rev. to 1985) § 31-349, as amended by Public Acts 1986, No. 86-31, of its intention to transfer liability to the fund for the plaintiff employee's compensation.[1] On appeal, the fund claims that the board

[1] General Statutes (Rev. to 1985) § 31-349, as amended by Public Acts 1986, No. 86-31, provides in relevant part: "(a) The fact that an employee has suffered previous disability, or received compensation therefor, shall not preclude him from compensation for a later injury, nor preclude compensation for death resulting therefrom. If an employee who has previously incurred, by accidental injury, disease or congenital causes, total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye, or who has other permanent physical impairment, incurs a second disability by accident or disease arising out of and in the course of his employment, resulting in a permanent disability caused by both conditions which is materially and substantially greater than that which would have resulted from the second injury alone, he shall receive compensation for the entire amount of disability, including total disability, less any compensation benefits payable or paid with respect to the previous disability, and necessary medical care, as elsewhere provided in this chapter, notwithstanding the fact that part of such disability was due to prior accidental injury, disease or congenital causes. The employer by whom the employee is employed at the time of the injury, or his insurance carrier, shall in the first instance pay all awards of compensation and all medical expenses provided by this chapter for the first one hundred four weeks of disability. As a condition precedent to the liability of the second injury fund, the employer or his insurance carrier shall, ninety days prior to the expiration of the one-hundred-four-week period, notify the custodian of the second injury fund of the pending case and shall furnish to said custodian a copy of the agreement

improperly affirmed the commissioner's determination that White Oak timely notified the fund of the transfer under § 31-349. We agree with the fund that White Oak's notice was not timely.[2]

The following facts and procedural history are relevant to our resolution of the fund's appeal. The plaintiff, Richard Gillis, first injured his right knee on July 7, 1981, while working for an employer unrelated to this appeal. Gillis again injured the same knee on November 6, 1986, while working for White Oak. Gillis injured his right knee a third time on April 20, 1992, while working for another employer unrelated to this appeal.

After hearings in 1993 and 1994 to determine the compensability of the 1986 injury and to decide which of Gillis' injuries were responsible for the medical opinion that Gillis should undergo a right knee replacement, the commissioner rendered his finding and award on October 4, 1994.[3] The commissioner found that on January 27, 1987, Gillis had reached maximum medical

or award together with all information purporting to support his claim as to the liability of the second injury fund, and shall make available to the custodian all medical reports as the custodian shall desire. Failure on the part of the employer or the carrier to comply does not relieve the employer or carrier of its obligation to continue furnishing benefits under the provisions of this chapter. . . ."

"We look to the statute in effect at the date of injury to determine the rights and obligations between the parties. See *Civardi* v. *Norwich,* 231 Conn. 287, 293 n.8, 649 A.2d 523 (1994); *Iacomacci* v. *Trumbull,* 209 Conn. 219, 222, 550 A.2d 640 (1988). This rule applies to the employer's right to transfer liability to the fund pursuant to § 31-349. See *Plesz* v. *United Technologies Corp.,* 174 Conn. 181, 186–87 and n.2, 384 A.2d 363 (1978)." *Dos Santos* v. *F.D. Rich Construction Co.,* 233 Conn. 14, 15–16 n.1, 658 A.2d 83 (1995).

[2] The fund also claims that the board improperly affirmed the commissioner's decision as to the extent of the fund's liability in this case. We do not reach that issue, however, because we agree with the fund that White Oak's notice was not timely. Because the notice was not timely, we conclude that the fund is not liable for the compensation and, therefore, we need not address the extent of any such liability.

[3] Gillis underwent a total knee replacement in September, 1998.

improvement and was left with 25 percent permanent partial disability in the right knee. The commissioner further assigned various portions of the 25 percent permanent partial disability to both the 1981 and 1986 injuries, concluding that 17.5 percent of the permanent disability was attributable to the 1986 injury. The fund was not a party to those proceedings.

On or about December 16, 1994, White Oak notified the fund, as required by § 31-349, that it sought to transfer liability for the 1986 injury to the fund. The fund took the position that the notice was untimely. The commissioner held another hearing on June 16, 1999, and concluded in his June 24, 1999 finding and award that notice was timely perfected on December 14, 1994, and that liability for the 1986 injury would transfer to the fund.[4] The fund appealed to the board from the commissioner's decision. On October 20, 2000, the board concluded that the commissioner correctly had determined that White Oak's notice was timely and affirmed the commissioner's decision. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the fund claims that the board improperly affirmed the commissioner's determination that White Oak timely notified the fund of the transfer. Specifically, the fund argues that the commissioner improperly calculated Gillis' period of disability when deciding whether notice under § 31-349 was timely. The fund advances two arguments in support of its position. In

---

[4] We note that White Oak argues that we may consider only the commissioner's findings in the June 24, 1999 finding and award because the fund never filed a motion to correct seeking to incorporate any or all of the October 4, 1994 findings into the June 24, 1999 decision. Although the fund rebuts that contention, we conclude that we need not address that issue because the June 24, 1999 finding and award, by itself, provides the findings necessary for our resolution of the fund's claim. Although the dissent states that we fail to analyze the issue of the motion to correct and fail to explain why we do not decide that issue, the preceding text provides ample explanation as to why we need not address White Oak's contention.

its brief, the fund asserts that for the purposes of calculating the first 104 weeks of disability under § 31-349, Gillis was "disabled" as of October 14, 1992, and remained disabled continuously thereafter. The commissioner found, in his June 24, 1999 finding and award, that Gillis had reached maximum medical improvement on that date and was left with a 23.17 percent permanent impairment as a result of the November 6, 1986 injury.[5] The fund takes the position that Gillis was continuously disabled from the date he was assigned the permanent disability rating because from that time on, he never ceased being disabled. At oral argument, the fund reasserted that position, but also argued that Gillis was disabled from the date of the second injury, November 6, 1986. We agree with the fund that White Oak's notice was untimely.

At the outset, we note our standard of review for the fund's claim. "Our standard of review of the board's determination is clear. [T]he [board's] hearing of an appeal from the commissioner is not a de novo hearing of the facts. Although the [board] may take additional

---

[5] We note that the fund makes the same argument for an even earlier period of time, namely, January 27, 1987, on the basis of the findings in the commissioner's October 4, 1994 finding and award that we previously discussed. We do not address that argument, however, based on our reasoning in footnote 4. Despite footnote 4, the dissent asserts that it was necessary for the fund to file a motion to correct because without it, the fund essentially is seeking to litigate issues of fact for the first time on appeal. We disagree. The fund does not seek to litigate facts, but rather challenges the commissioner's conclusion on the basis of the facts that were found. Although the fund did assert an argument that relied on the October 4, 1994 finding and award, the fund also asserted the same argument with regard to findings stated only in the June 24, 1999 finding and award. In essence, the fund has argued on appeal that even if we do not look at the findings from 1994 and focus only on the 1999 decision, the facts found, which are unchallenged, do not support the commissioner's conclusion. The fund, therefore, has accepted those findings and levied an attack on the commissioner's conclusion. As previously stated, we base our decision on only the June 24, 1999 finding and award, as that is all that is necessary for the resolution of this appeal.

material evidence, this is proper only if it is shown to its satisfaction that good reasons exist as to why the evidence was not presented to the commissioner. Otherwise, it is obliged to hear the appeal on the record and not retry the facts. . . . [T]he power and duty of determining the facts rests on the commissioner, the trier of facts. . . . The conclusions drawn by him from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Williams* v. *Best Cleaners, Inc.*, 237 Conn. 490, 500–501, 677 A.2d 1356 (1996).

We further note that the question of timeliness with regard to § 31-349 is not one of first impression. In *Karutz* v. *Feinstein & Herman, P.C.*, 59 Conn. App. 565, 567, 757 A.2d 680, cert. denied, 254 Conn. 949, 762 A.2d 901 (2000), an employee was injured at work, but continued to perform her duties and to receive regular pay for almost fourteen months after the injury. Subsequently, the employee was determined to be temporarily totally disabled and then temporarily partially disabled. Id. When the insurer sought to transfer liability to the fund, the fund contested the timeliness of the transfer, arguing that the employee was disabled from the date of the injury, even though she had lost no pay or time from work as a result of the injury. Id., 568–69. The commissioner, however, determined that the notice was timely because the disability period did not begin on the date of injury, and the board affirmed that decision. Id., 571–72.

On appeal, we stated "[t]he issue of timeliness centers on the meaning of the word 'disabled' contained in § 31-349. The terms 'disabled' and 'disability' are not defined in the workers' compensation statutes. Recent decisions of our Supreme Court, however, have established

the meaning of 'disability' for purposes of § 31-349." Id., 569.

We then quoted from *Williams* v. *Best Cleaners, Inc.*, supra, 237 Conn. 498, in which our Supreme Court stated that "[i]n the context of § 31-349, the term disability is susceptible of two meanings—physical impairment and loss of earning capacity. . . . Permanent disability is not defined within Connecticut's Workers' Compensation Act. General Statutes § 31-275 et seq. Previous disability, however, is defined within § 31-275 (20) as an employee's preexisting condition caused by the total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye resulting from accidental injury, disease or congenital causes, or other permanent physical impairment. . . . In construing the act . . . this court makes every part operative and harmonious with every other part insofar as is possible. . . . In addition, the statute must be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation. . . . Thus, the meaning of the term disability should not vary simply because it is modified by permanent rather than previous. Accordingly, we define disability, for the purpose of § 31-349 (a), to refer to a claimant's physical impairment." (Citations omitted; internal quotation marks omitted.) *Karutz* v. *Feinstein & Herman, P.C.*, supra, 59 Conn. App. 569–70.

We determined in *Karutz* that "a person can be disabled for the purposes of § 31-349 even though he or she can carry on all the facets of his or her employment. The test is whether a claimant is physically impaired, not whether there exists a de facto inability to earn a wage." Id., 570. We also noted, as decided by our Supreme Court in *Innocent* v. *St. Joseph's Medical Center*, 243 Conn. 513, 705 A.2d 200 (1998), that "the rate of pay received by the claimant and the number of hours worked upon her return to work are not determi-

native of the time period of her disability under § 31-349 (a). Rather, the determinative factor as to whether the time period is to be included in calculating the 104 week period of disability that triggers the date by which the employer must furnish notice to the fund, is whether the claimant is medically impaired as a result of his or her work-related injury." (Internal quotation marks omitted.) *Karutz* v. *Feinstein & Herman, P.C.*, supra, 59 Conn. App. 571.

Reversing the board's affirmance of the commissioner's decision in *Karutz*, we stated that the commissioner had based his disability determination on the employee's ability to perform her job rather than on the date of medical impairment. Id., 572. On the basis of *Karutz* and the cases cited therein, it is clear that a person is disabled under § 31-349 for any period in which a medical physical impairment is established by the evidence before the commissioner. In the present case, a review of the commissioner's June 24, 1999 decision reveals that his conclusion resulted from inferences unreasonably drawn from the facts found.

The commissioner determined that Gillis' first 104 weeks of disability concluded on April 20, 1999, and that White Oak's notice, perfected on December 14, 1994, was timely because it was filed more than ninety days prior to the expiration of the first 104 weeks of disability. The commissioner reached that conclusion after finding that Gillis was totally disabled following his second injury for 16 3/7 weeks, from November 6, 1986, through March 1, 1987. The commissioner also found that subsequent to March 1, 1987, Gillis "returned to work full duty and was not disabled again until October 14, 1992, when he was entitled to permanent partial disability . . . ." That reference to October 14, 1992, relates to the commissioner's further finding that Gillis had reached maximum medical improvement as of October 14, 1992, and that as of that date, he had a

permanent partial disability of 23.17 percent as a result of the November 6, 1986 injury.

The commissioner also found that Gillis was entitled to 55 3/7 weeks of permanent partial disability, from October 14, 1992, the date of maximum medical improvement, through November 5, 1993. In addition, the commissioner found that Gillis had been paid total disability benefits for 32 1/7 weeks as a result of the replacement surgery, from September 8, 1998, through April 20, 1999. In making these determinations, the commissioner stated that "[f]or the period[s] from March 1, 1987, through October 13, 1992, and November 6, 1993, through December 14, 1994, the date as of when notice was perfected, there is no evidence of medical or physical limitations or impairments attributable to the November, 1986 injury and, therefore, such period is not included in the calculation of timely notice under § 31-349 (a)."

We first note that the June 24, 1999 findings establish clearly that Gillis became physically impaired on the date of his second injury, November 6, 1986, because the commissioner found that Gillis was totally disabled for the period of November 6, 1986, through March 1, 1987. The question we must next address is whether Gillis ever fully recovered from the November 6, 1986 injury and returned to an unimpaired medical status. That is a critical matter because if at some point Gillis no longer was physically impaired, then he would not be disabled under § 31-349, and the time from his full recovery until the next impairment would not be included in calculating the first 104 weeks of his disability.

The commissioner determined that Gillis no longer was disabled after March 1, 1987, and through October 13, 1992. Specifically, the commissioner found, in finding number nine, that Gillis had returned to work "full

duty" after March 1, 1987, and was not disabled again until 1992. The commissioner then stated, in paragraph D of his conclusion, with regard to the same time period discussed in finding number nine, that "there is no evidence of medical or physical limitations or impairments attributable to the November 6, 1986 injury . . . ."[6] Thus, the commissioner concluded that Gillis was not impaired after March 1, 1987, and, because Gillis no longer was impaired, the commissioner further determined that Gillis no longer was disabled for purposes of § 31-349.

We conclude that the commissioner improperly determined Gillis' periods of disability. The commissioner's conclusion that Gillis was unimpaired after March 1, 1987, rests on the predicate that Gillis had recovered fully from his second injury as of that date. That conclusion is inconsistent with the commissioner's other findings. Given the irreconcilable nature of that inconsistency, we conclude that the commissioner's decision resulted from an unreasonable inference from the facts found.

In reaching our determination, we rely specifically on finding number five, in which the commissioner found that after Gillis had reached maximum medical improvement on October 14, 1992, Gillis had a permanent partial impairment of 23.17 percent as a result of the November 6, 1986 injury. That finding is critical because the assignment of a 23.17 percent permanent disability rating subsequent to March 1, 1987, is medically inconsistent with a conclusion that Gillis had recovered fully from the second injury by March 1, 1987, and no longer was impaired as of that date.[7]

---

[6] We note that although the commissioner's use of the term "full duty" indicates that he may have based his decision about Gillis' disabled status on Gillis' employment record, we need not discuss that implication because our decision relies on other findings.

[7] Although the dissent asserts that there is no analysis as to how the commissioner's findings are inconsistent with the medical evidence, it is not our role to review the evidence that was presented to the commissioner

The assignment of the permanent disability rating, after Gillis' knee had healed as well as it could, indicates that he never fully recovered from the second injury. That is the only conceivable conclusion in light of the fact that he was deemed to have a 23.17 percent disability *after having reached maximum medical improvement.* In light of that, we construe the commissioner's finding to indicate that Gillis continuously was impaired by the second injury from the date it occurred through the date of maximum medical improvement and thereafter. On the basis of that impairment, logic dictates that at a minimum, Gillis also was continuously disabled at a rate of between 23.18 percent and 100 percent from the time of the injury on November 6, 1986, through the date of maximum medical improvement on October 14, 1992. In sum, the assignment of the permanent disability rating demonstrates that Gillis was, and remains, physically impaired, and that he did not totally recover. Because he did not fully heal, he must have suffered a continuous impairment from the date of the injury.

As *Karutz* clearly informs us, for the purposes of § 31-349, disability refers to a claimant's physical impairment. A person can be disabled for the purposes of § 31-349 even though he can carry on all the aspects of his employment. Guided by that principle, we conclude the commissioner's June 24, 1999 findings reveal that Gillis continuously was physically impaired from the time of the second injury, November 6, 1986,

in this case. As the dissent itself notes, we must defer to the commissioner's decision to believe or to disbelieve the evidence on which findings of fact rest. Although the dissent goes into great detail in reviewing the evidence presented in this case, we believe that such review is not appropriate because we are not the fact finder. Rather, we must confine ourselves to the facts as found by the commissioner on the basis of his hearing of the evidence. Furthermore, to the extent that the dissent suggests that we do not analyze how the commissioner's findings themselves are inconsistent, the present discussion, in addition to what follows, provides a clear analysis.

onward.[8] Given that uninterrupted impairment, Gillis continuously was disabled from November 6, 1986.[9]

In light of our interpretation of the commissioner's findings, our calculation of the first 104 weeks of disability for the purposes of § 31-349 leads us to conclude that the proper disability period was continuous in this case and, therefore, went uninterrupted from the date of the injury, November 6, 1986, through the 104 weeks, and expired in November, 1988.[10] In light of that conclusion, to file its transfer notice in a timely manner, White Oak would have had to file notice ninety days prior to the November date, sometime in August, 1988. The commissioner's findings reveal that White Oak perfected notice on December 14, 1994. We conclude that

[8] Although the dissent argues that the evidence supported the commissioner's conclusion, the dissent goes outside of the commissioner's findings and conducts an independent review of the evidence presented to the commissioner. Although some of what the dissent reviews was incorporated into the commissioner's findings, it is not our role to make our own determination as to the evidence presented to the commissioner. In reviewing the evidence, the dissent, in essence, makes its own findings of fact that support the commissioner's conclusion. Moreover, we believe the dissent's evidentiary review on the degree of seriousness of the 1986 injury is not relevant to the analysis because the correct focus is on the commissioner's findings relevant to 1987 and beyond, after the commissioner determined that Gillis had recovered.

[9] We note that our decision here differs in analysis and reasoning from both of the arguments asserted by the fund and that we do not reach our decision under either of the fund's specific arguments. Rather, our conclusion that Gillis continuously was impaired from the date of the second injury relies on the conjoined effect of both of the fund's arguments about the date of injury and the assignment of a permanent disability rating. We further note that our decision does not create a per se rule that the assignment of a permanent disability rating renders the assignee of that condition continuously disabled ad infinitum. As the dissent contemplates, corrective surgery, time or the body's natural ability to mend itself may allow a person to recover fully from an injury even after having been assigned a permanent disability rating. Those factors, however, are not relevant under the facts of this case.

[10] We note that we need not deal with precise dates because White Oak's filing date is so far beyond the end of the 104 week period that a discussion that utilizes months and years yields adequate accuracy.

this filing was untimely and, as a result, the commissioner improperly transferred liability for Gillis' 1986 injury to the fund.[11]

We conclude the conclusions drawn by the commissioner in this case resulted from unreasonable infer-

[11] On the basis of the complexity of Gillis' injury record in this case and the multiple hearings held, we note that although we have analyzed the fund's claim using the June 24, 1999 finding that Gillis had reached maximum medical recovery on October 14, 1992, we also consider another possibility with regard to the fund's claim. In so doing, we note that the commissioner's October 4, 1994 decision found that with regard to the second injury, Gillis had reached maximum medical improvement on January 27, 1987, and, as a result of the 1986 injury, was left with a 25 percent permanent partial disability. The commissioner also found, in paragraph F of his 1994 findings, which discussed the third injury in 1992, that Gillis had reached maximum medical improvement on October 14, 1992. We further note that in his 1994 final award, the commissioner made reference to White Oak's liability for the time period of 1986 and 1987, but referred to October 14, 1992, as the date of maximum medical improvement.

On the basis of the potential ambiguity with regard to the maximum improvement for each injury in the commissioner's 1994 finding and award, we note two possibilities with regard to the commissioner's 1999 findings, which relied on the 1994 findings. First, the commissioner, in 1999, determined that Gillis had reached maximum medical improvement for his 1986 injury nearly six years later. Or, the commissioner, in his 1999 finding, confused the date of maximum medical improvement for Gillis' 1992 injury with the date of maximum medical improvement for the second injury in 1986.

We note, however, without deciding, that even if that error occurred, it would not change our decision in this case because the commissioner's decision in 1999 as to Gillis' disability period still is inconsistent with the facts. Specifically, we note that if Gillis was found to have maximum medical improvement from the second injury on January 27, 1987, and was assigned a permanent disability rating on that date, then that assignment of permanent disability is inconsistent with the commissioner's 1999 finding that Gillis had completely recovered from his 1986 injury and no longer was impaired as of March 1, 1987. In other words, the finding of no impairment on March 1, 1987, is irreconcilable with the prior January 27, 1987, assignment of the permanent disability rating. Under those circumstances, we note that Gillis would be impaired, as he healed, from the date of the second injury to the date of maximum medical improvement on January 27, 1987, and that after that date, he would be deemed impaired because he had received a 25 percent permanent disability. Therefore, he would have been continuously disabled under those circumstances from the date of his second injury.

ences drawn from the facts found. We reverse the board's affirmance of the commissioner's decision that notice to the fund was timely and that liability for the November 6, 1986 injury should transfer to the fund.

The decision of the workers' compensation review board is reversed and the matter is remanded with direction to reverse the commissioner's decision to transfer liability to the second injury fund.

In this opinion FOTI, J., concurred.

FLYNN, J., dissenting. I respectfully dissent from the result reached by the majority for several reasons and would affirm the decision of the worker's compensation review board.

First, the majority does not contend that there was no medical evidence to support the trial commissioner's findings. There was such substantial evidence. Under our standard of appellate review, the commissioner's factual findings should stand where supported by substantial evidence. See *Thompson* v. *Roach*, 52 Conn. App. 819, 824, 728 A.2d 524, cert. denied, 249 Conn. 911, 733 A.2d 227 (1999).

Second, not only did the second injury fund (fund) never make any effort to submit proposed draft findings to the commissioner, but because it made no motion to correct the commissioner's findings, under long established precedent from our Supreme Court, the commissioner's findings must stand. *Mack* v. *Blake Drug Co.*, 152 Conn. 523, 525, 209 A.2d 173 (1965).

Finally, in light of the substantial evidence supporting and consistent with the commissioner's decision, coupled with the fund's failure to file a motion to correct findings it claimed were inconsistent, I disagree with the majority's contention that the commissioner's June 24, 1999 decision resulted from inferences unreasonably drawn from the facts found.

Our workers' compensation law permits a commissioner to find that a worker may be temporarily totally disabled or partially permanently disabled by a second injury without concluding by necessity that the impairment or physical limitations must have been continuous, simply because after suffering a third injury and reaching maximum medical improvement the commissioner finds that the permanency found after that third injury was due in part to the second injury and an earlier first injury.

I begin by setting forth some factual background.The plaintiff, Richard Gillis, suffered three successive work related injuries to his right knee while working for three successive employers, the last two of which increased the partial permanent disability of the first. See *Gillis* v. *White Oak Corp.*, 49 Conn. App. 630, 635 n.10, 716 A.2d 115, cert. denied, 247 Conn. 919, 722 A.2d 806 (1998).

The first of the injuries occurred on July 7, 1981, the second on November 6, 1986, and the third on April 20, 1992.

This case is before us because General Statutes (Rev. to 1985) § 31-349 (b), as amended by Public Acts 1986, No. 86-31, requires that "as a condition precedent to an employer's transfer of liability to the [second injury] fund for an employee's permanent disability, the employer must furnish notice of intent to transfer to the custodian of the fund ninety days prior to the expiration of the first 104 weeks of a claimant's disability. *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 393, 618 A.2d 1340 (1993)." *Karutz* v. *Feinstein & Herman P.C.*, 59 Conn. App. 565, 568, 757 A.2d 680, cert. denied, 254 Conn. 949, 762 A.2d 901 (2000).

The fund asserts that the December 16, 1994 notice from the second employer, White Oak, to the fund was untimely because, in the fund's view, the December 14, 1994 notice of intent to transfer liability to the fund

was given more than one year and nine months after the injury and therefore was not in compliance with the pertinent statute in effect. In the fund's view, the 1999 decision of the commissioner was, thus, illegal, unreasonable and illogical in its application of the facts to the law because he found that the plaintiff was disabled from November 7, 1986, to March 1, 1987, and was not disabled again until October 14, 1992.

In reversing the board's determination that the commissioner correctly determined that the notice to the fund was timely, the majority specifically relies on the commissioner's finding that on the date of maximum medical improvement, October 14, 1992, the plaintiff had a "permanent partial impairment of 23.17 percent . . . ." From this, despite substantial medical evidence in the record to the contrary, the majority makes the illogical leap that, "at a minimum, [the plaintiff] also was continuously disabled at a rate of between 23.18 percent and 100 percent from the time of the injury on November 6, 1986, through the date of maximum medical improvement on October 14, 1992." The majority then concludes that the "first 104 weeks of disability [less 90 days]" in which to notify the fund ran continuously from the November 6, 1986 time of injury, not intermittently as the commissioner and board had concluded.

In his June 24, 1999 decision, the commissioner specifically stated that "upon all the evidence" before him, "I am satisfied, conclude and find that:

\* \* \*

"C) The claimant's first 104 weeks of disability as documented by the medical record runs through to April 20, 1999 as follows:

"Temporary total disability from November 6, 1986, through March 1, 1987 (16 3/7 weeks)

"Permanent partial disability from October 14, 1992, through November 5, 1993, (55 3/7 weeks)

"Temporary total disability from September 8, 1998, through April 20, 1999 (32 1/7 weeks)

"D) For the period from March 1, 1987, through October 13, 1992, and November 6, 1993, through December 14, 1994, the date as of when notice was perfected, there is no evidence of medical or physical limitations or impairments attributable to the November, 1986 injury and therefore such period is not included in the calculation of timely notice under § 31-349 (a)."

In reaching its conclusion that the commissioner improperly made those findings, the majority states: "We conclude that the commissioner improperly determined Gillis' periods of disability. The commissioner's conclusion that Gillis was unimpaired after March 1, 1987, rests on the predicate that Gillis had recovered fully from his second injury as of that date. That conclusion is inconsistent with the commissioner's other findings. Given the irreconcilable nature of that inconsistency, we conclude that the commissioner's decision resulted from an unreasonable inference from the facts found."

I find no analysis or reference in the majority opinion as to how any piece of medical evidence is inconsistent with the commissioner's findings that Gillis was unimpaired for a period of time after March 1, 1987. I thus dissent from that conclusion.

My review and analysis of the actual evidence before the commissioner shows that there was, in fact, substantial evidence supporting both the commissioner's finding of a period of no disability and the board's affirmance of that finding and refusal to retry the facts. Numerous medical reports in evidence agree that prior to all of his injuries, the plaintiff suffered from degenera-

tive arthritis of both knees. Dr. Robert L. Fisher, the commissioner's examining physician, stated in a July 8, 1993 report that was in evidence: "I feel the injury in 1986 clearly was a temporary aggravation of obviously severe pre-existing problems. I would not attribute any permanent disability to the injury of 1986."[1]

Fisher's evidence that the 1986 injury caused only *temporary aggravation* of the knee condition and caused *no* permanent disability to the plaintiff was substantial evidence supporting a finding that the plaintiff was not continuously disabled.

"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Schallenkamp* v. *DelPonte*, 229 Conn. 31, 40, 639 A.2d 1018 (1994).

"In determining whether an administrative finding is supported by substantial evidence, a court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness . . . in whole or in part." (Internal quotation marks omitted.) *Bancroft* v. *Commissioner of Motor Vehicles*, 48 Conn.

---

[1] Fisher also reported: "I think this man should proceed with a total knee replacement. I think the need for this replacement is related to the preexisting degenerative change in his knee, which undoubtedly would have progressed over the last fifteen years with or without the above injuries and required a replacement with or without those injuries. Regardless of whether this man elects to proceed with a total knee replacement, I think he should give up construction work and find some more sedentary type of occupation. I have not seen X rays of his left knee, but apparently he also has significant degenerative arthritis in this knee as well."

App. 391, 400, 710 A.2d 807, cert. denied, 245 Conn. 917, 717 A.2d 234 (1998).

Another physician, Dr. Glen Taylor, a specialist in orthopedics who treated the plaintiff, stated in a September 16, 1991 report that "I do not think the injury of November of 1986 to his right knee was significant. I see no mention of it in my history about one month later and at that time recommended arthroscopy based upon worsening degenerative changes within his knee." This evidence from the plaintiff's own treating physician, finding the 1986 injury "not significant," affords a substantial basis of fact from which the intermittency of disability can be reasonably inferred.

Finally, and perhaps most telling, a late May 18, 1997 report from Taylor, also in evidence, states that Gillis' injuries after 1981 were "minor" and "did not cause any dramatic deterioration of his knee *but rather with time contributed to further deterioration.*" (Emphasis added.) This is another piece of substantial evidence affording a basis in fact from which the commissioner could have inferred that the disability arising out of the "minor" 1986 injury was not continuous from the date of the 1986 injury.

Furthermore, the majority cites no medical evidence in the record to rebut the commissioner's finding that for the periods from March 1, 1987, through October 13, 1992, and from November 6, 1993, through December 14, 1994, there was "no evidence of medical or physical limitations or impairments attributable to the November, 1986 injury . . . ."

The commissioner's holding that the disability was not continuous was consistent with the substantial body of medical evidence before the tribunal.

I next turn to the failure of the majority to analyze, decide, or give any explanation for failing to decide a

second issue distinctly raised by the defendant employer, White Oak. In its brief, White Oak states: "[A]t no time during these proceedings has the [fund] filed a motion to correct in accordance with Administrative Regulation § 31-301-4."[2] Our Supreme Court long has recognized that where the findings and conclusions of a trial commissioner have not been attacked by way of a motion to correct, such findings and conclusions must stand. *Mack* v. *Blake Drug Co.*, supra, 152 Conn. 525; see also *Vanzant* v. *Hall*, 219 Conn. 674, 679, 594 A.2d 967 (1991).[3] A principal treatise, which has been cited as authority more than twenty-five times in the last twenty-five years by our Supreme Court and this court, puts the matter this way: "If the appeal is premised upon or includes a claim that the originating commissioner's finding of facts was incorrect, then in addition to the petition to review [by the board], one must also file a motion to correct the findings." J.

[2] Section 31-301-4 of the Regulations of Connecticut State Agencies, entitled "Correction of finding," provides: "If the appellant desires to have the finding of the commissioner corrected he must, within two weeks after such finding has been filed, unless the time is extended for cause by the commissioner, file with the commissioner his motion for the correction of the finding and with it such portions of the evidence as he deems relevant and material to the corrections asked for, certified by the stenographer who took it, but if the appellant claims that substantially all the evidence is relevant and material to the corrections sought, he may file all of it so certified, indicating in his motion so far as possible the portion applicable to each correction sought. The commissioner shall forthwith, upon the filing of the motion and of the transcript of the evidence, give notice to the adverse party or parties."

[3] The *Vanzant* court stated: "A motion to correct the commissioner's finding, as provided in § 31-301-4 of the Regulations of Connecticut State Agencies, is the proper vehicle to be used when an appellant claims that the commissioner's finding is incorrect or incomplete. We have long held that this motion is not merely a technical requirement and that the failure to file this motion justifies dismissal of an appeal, for if an appellant claims that the finding is incorrect, the matter should first be called to the attention of the commissioner that he may have an opportunity to supply omitted facts or restate findings in view of the claims made in the motion." (Internal quotation marks omitted.) *Vanzant* v. *Hall*, supra, 219 Conn. 679.

Asselin, Connecticut Workers' Compensation Practice Manual (1985) p. 261.

The compensation review board, in reviewing the commissioner's decision, noted that "in its trial brief filed with the commissioner, the fund made no specific arguments or proposed findings regarding the dates of the claimant's disability for the purposes of determining the 104 weeks" and further found that the fund's arguments on appeal were "an unreasonable attempt to litigate an issue which it chose not to litigate before the trial commissioner." In its decision, the board stated:

"The trial commissioner specifically found that for the period from March 1, 1987, through October 13, 1992, and November 6, 1993, through December 14, 1994, there was 'no evidence of medical or physical limitations or impairments attributable to the November, 1986 injury and therefore such period is not included in the calculation of timely notice under § 31-349 (a).' . . . Apparently, (it is not explained in its brief) the fund in its appeal has chosen the January 27, 1987 date based upon the trial commissioner's finding in his October 4, 1994 decision that Dr. Taylor assessed a 25 percent permanent partial disability of the claimant's right knee on January 27, 1987.

"The fund conveniently overlooks, however, that in the October 4, 1994 decision, the trial commissioner awarded all permanent partial disability benefits based upon an October 14, 1992 date of maximum medical improvement. In the instant case, the trial commissioner, in his October 4, 1994 decision, chose to rely upon the October 14, 1992 date of maximum medical improvement as the date of the claimant's permanent partial disability. This was a factual determination for the trial commissioner to make, and we will not allow the fund to retry the facts before this board, especially where it has not filed a motion to correct."

The fund's failure to request factual findings from the commissioner, or to request that he correct the findings he actually made, does not permit the fund to litigate these findings for the first time on appeal to this court. Nor can we upset a commissioner's factual findings in the face of substantial evidence supporting them.

Because both the plaintiff's treating orthopedic physician and the commissioner's examining physician found the second injury to be slight, contributing to the impairment only after the passage of time, the commissioner had substantial evidence in the record before him supporting the finding of intermittency in the impairment of the plaintiff.

It is an axiom of our administrative law needing no citation that the scope of judicial review of the rulings of an administrative agency is limited and that administrative remedies must first be exhausted before looking to the courts for relief. A litigant cannot look to the appellate process as a de novo opportunity to litigate matters not raised below.

That principle is applicable here where the administrative process permits a litigant such as the fund both to request particular findings and after a decision is made to move to correct factual findings. Here, the fund did neither.

Where the fund had administrative remedies which it did not use, much less exhaust, I disagree that we should permit it to bypass those remedies and resort to direct appeal to the courts. To permit it to do so flies in the face of the well established purposes of the doctrine of exhaustion of administrative remedies: (1) to effect legislative intent that matters be handled by the administrative agency statutorily charged with them where it is possible to obtain relief there; (2) to foster an orderly process of administrative adjudication and

judicial review, offering a reviewing court the benefit of the agency's findings and conclusions, thus relieving courts of the burden of prematurely deciding questions that, entrusted to an agency, may receive a satisfactory administrative disposition and avoid the need for judicial review; and (3) to ensure the integrity of the agency's role in administering its statutory responsibilities. See *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 281–82, 788 A.2d 60 (2002).

Finally, I address the majority's contention that the commissioner's decision resulted from inferences unreasonably drawn from facts found, which it links to the commissioner's findings that no evidence existed of medical or physical limitations or impairments attributable to the November, 1986 injury during certain time periods. It takes issue with the commissioner's finding that "[t]here is no evidence of medical or physical limitations or impairments attributable to the November, 1986 injury" "for the period[s] from March 1, 1987, through October 13, 1992, and November 6, 1993, through December 14, 1994, the date when notice was perfected . . . ."

It is again worth noting that neither the fund, nor the majority, points us to *any evidence* of medical or physical limitations or impairments during those time periods in which the commissioner found no evidence.

The majority does recognize that "if at some point Gillis no longer was physically impaired, then he would not be disabled under § 31-349, and the time from his full recovery until the next impairment would not be included in calculating the first 104 weeks of his disability." I take issue with the claimed inconsistency the majority finds in paragraph five of the findings. That finding states:

"5) The claimant was found to have reached maximum medical improvement as of October 14, 1992, with

a total overall entitlement to a permanent impairment of 23.17 percent, fifty-five and three sevenths (55 3/7) weeks as a result of the November 6, 1986 injury."

I disagree with the majority's conclusion that "the assignment of a 23.17 percent permanent disability rating subsequent to March 1, 1987, is medically inconsistent with a conclusion that Gillis had recovered fully from the second injury by March 1, 1987, and no longer was impaired as of that date."

The majority fails to appreciate the significance of the fact that our statutory workers' compensation system contemplates injuries that may be only temporarily totally disabling. See General Statutes § 31-295 (a). Finding number five was made as of an October 14, 1992 date of maximum improvement after the plaintiff had suffered a third injury on April 20, 1992. The majority cites no authority for the proposition that once a partial permanent disability rating is established, it must be continuously disabling even if there was surgical amelioration and no further medical evidence of impairment or disability for a long period of time after the injury, or where only with the passage of time the injury contributed to deterioration of the previously arthritic knee resulting ultimately in a partial permanent disability. I find no logic in the majority's premise precisely because competent medical evidence before the commissioner from the treating physician, Taylor, indicates no continuous impairment from what originally was viewed as a minor injury to a brittle plaintiff suffering from preexisting degenerative arthritis unrelated to any of his work injuries.

I would affirm the conclusions of the compensation review board. It affirmed the commissioner's ruling that the notice was timely. It observed that the fund had failed to make an adequate record before the commissioner, and failed to use the administrative remedies it

had to request draft findings or to move to correct the commissioner's findings, which administrative regulations and our case law both permitted and obligated it to do. Under those circumstances, the board stated that it would not retry the facts. Nor should we.

I respectfully dissent.